UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

DEBORAH VOSS,

                          Plaintiff,

          -against-                                                    5:15-cv-0232 (LEK/TWD)

BANK OF AMERICA, N.A. *et al.*,

                          Defendants.

_____

## MEMORANDUM-DECISION and ORDER

## I.    INTRODUCTION

        Plaintiff Deborah Voss ("Plaintiff") commenced this action against Defendants Bank of

America, N.A. ("Bank of America") and Ocwen Loan Servicing, LLC ("Ocwen") (collectively,

"Defendants") alleging various causes of action relating to Defendants' servicing and modification

of Plaintiff's home mortgage.  See Dkt. No. 1 ("Complaint").  Presently before the Court is

Defendant Bank of America's Motion to dismiss.  Dkt. Nos. 15 ("Motion"); 17 ("Memorandum").[1]

Plaintiff opposes the Motion.  Dkt. No. 22 ("Opposition").  Defendants filed a Reply.  Dkt. No. 27

("Reply").[2]  For the following reasons, the Motion is granted in part and denied in part.

_____

        [1] Ocwen filed a Motion seeking to join Bank of America's Motion.  Dkt. No. 18.  Since
Ocwen raises no arguments of its own, no party opposes Ocwen's Motion, and Plaintiff will not be
prejudiced by granting the Motion, the Court will treat Bank of America's Motion (Dkt. No. 15) as a
Motion filed by both Defendants.  See Gross v. City of Albany, No. 14-cv-0736, 2015 WL 5708445,
at *3 (N.D.N.Y. Sept. 29, 2015) (Kahn, J.) ("Where a motion to join is unopposed, the arguments
proffered by the defendant initiating the motion apply equally to all co-defendants, and granting the
motion to join will not prejudice the plaintiff, the motion to join is generally granted.")

        [2] Ocwen similarly filed a Motion seeking to join Bank of America's Reply.  Dkt. No. 28.
Accordingly, the Court will treat Bank of America's Reply (Dkt. No. 27) as a Reply filed by both
Defendants.

## II.    BACKGROUND[3]

### A. Bank of America

On December 12, 2002, Plaintiff entered into a home equity line of credit with Fleet Bank for $203,100. Compl. ¶ 9. The line of credit was collateralized by a mortgage lien. Id.[4] In 2009, Fleet Bank merged with Defendant Bank of America. Id. ¶ 10. Bank of America currently owns Plaintiff's loan. Id. ¶ 11. Until 2011, the loan was serviced directly by Bank of America and its predecessor, Fleet Bank. Id. ¶ 12. In February 2008, Plaintiff fell behind in her payments for the first time. Id. Plaintiff alleges that an issue with her insurance company was the reason for her nonpayment and stated that she did her best to keep up with her mortgage payments despite her financial difficulties. Id.

In July 2008, Bank of America informed Plaintiff that she had been selected for loan modification. Id. ¶ 13. Plaintiff contends that she neither requested nor consented to the loan

_____

[3] Because this matter is before the Court on a motion to dismiss, the allegations of the Complaint are accepted as true and form the basis of this section. See Boyd v. Nationwide Mut. Ins. Co., 208 F.3d 406, 408 (2d Cir. 2000); see also Matson v. Bd. of Educ., 631 F.3d 57, 72 (2d Cir. 2011) (noting that, in addressing a motion to dismiss, a court must view a plaintiff's factual allegations "in a light most favorable to the plaintiff and draw[] all reasonable inferences in her favor").

[4] Defendants argue that Plaintiff obtained a mortgage rather than a line of credit from Fleet Bank. Mem. at 2. In the Complaint, Plaintiff also refers to the loan as a "mortgage," rather than a line of credit. See, e.g., Compl. ¶¶ 9; 12. Defendants contend that the mortgage, note, and HUD Financing Statement show that Plaintiff obtained a mortgage and not a line of credit. Mem. at 2. The Court may consider the documents attached to the Complaint without converting the Motion into a motion for summary judgment. See FED. R. CIV. P. 10(c) ("A copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes."); see also Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir. 2009) ("The complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference."). Accordingly, the Court finds that Plaintiff obtained a home mortgage, rather than a line of credit.

modification.  Id.  Despite not having her consent, Bank of America sent Plaintiff a loan

modification and informed her that signing it would allow her to avoid foreclosure.  Id.

In March 2009, Plaintiff spoke with Bank of America employee Valencia Almond, who

informed Plaintiff that the modification program would convert delinquent payments, interest, fees,

and delinquent taxes to principal in the new loan.  Id. ¶ 14.  Additionally, the new loan would have a

lower interest rate.  Id.  The modification converted the mortgage to a traditional, closed-end

mortgage.  Id. ¶ 15.  However, the modification failed to include all of the delinquent property taxes

in the new principal amount.  Id. ¶ 16.  Plaintiff signed the modification and continued to make

payments, while "disputing various errors for multiple months in 2009."  Id. ¶ 17.

On July 3, 2009, Bank of America obtained insurance on Plaintiff's house without her

consent.  Id. ¶ 18.  Plaintiff already had homeowner's insurance on the property and mailed a copy

of her policy to Bank of America.  Id.  Plaintiff believed that Bank of America's insurance premium

charge was unnecessary and requested the policy's cancellation.  Id.  On September 29, 2010,

Plaintiff was charged $1,341 for insurance, even though she notified BAC Home Loans Servicing,

LP ("BAC"), her servicer at the time, on August 5, 2010 that she had already procured her own

homeowner's insurance policy.  Id. ¶ 24.

On October 9, 2009, Plaintiff received a letter stating that her escrow account was

inadequately funded.  Id. ¶ 19.  Plaintiff claims that she never authorized any money to be held in

escrow.  Id.  Plaintiff received an escrow statement on November 19, 2009 and learned that the back

taxes she owed were erroneously included in the escrow account, rather than in the modified loan's

principal.  Id.

**B. BAC**

On October 21, 2009, Bank of America informed Plaintiff that her loan was going to be serviced by BAC moving forward.  Id. ¶ 20.  Plaintiff repeatedly contacted BAC to attempt to correct the perceived errors with her modified mortgage.  Id. ¶ 21.  Plaintiff repeatedly received form letters indicating that she needed to contact BAC, despite the fact that she was in weekly contact with them.  Id. ¶ 22.  Plaintiff admits that she withheld payments to BAC "because BAC continually failed to address Plaintiff's concerns or correct their loan errors."  Id. ¶ 23.  On September 1, 2010, BAC sent Plaintiff an acceleration notice.  Id.  Thereafter, BAC sent Plaintiff multiple acceleration notices without addressing the disputed errors with the mortgage.  Id.

In May 2011, Plaintiff received a letter from BAC explaining that her previous payment was only a partial payment, despite her belief that it was a full payment.  Id. ¶ 25.  Plaintiff's monthly payment had been recalculated based on the fact that the escrow account reflected delinquent taxes that were not rolled into the modified loan's principal.  Id.

Although Plaintiff does not specify the date, she alleges that after almost two years, she was notified that there had been a designated representative assigned to her loan throughout its duration.  Id. ¶ 27.  However, rather than allowing Plaintiff to contact the designated representative directly, BAC repeatedly referred Plaintiff to multiple unassigned representatives who were unfamiliar with the underlying issues associated with the loan.  Id.  Plaintiff contends that BAC failed to provide her with meaningful assistance.  Id. ¶ 28.  BAC would discuss the issues with Plaintiff, then send her form letters that reflected the previously discussed errors in her loan modification.  Id.  Plaintiff sent BAC a letter summarizing the outstanding issues on February 20, 2010, but never received a response.  Id.

4

## C. Saxon

On June 10, 2011, Plaintiff was informed that her loan had been transferred back to Bank of America by BAC, and the loan would be serviced by Saxon. Id. ¶ 29. Plaintiff then contacted Bank of America and requested that the errors present in the modified loan that were unresolved by BAC be addressed before the loan was sent to Saxon. Id. ¶ 30. Plaintiff did not receive a response from Bank of America. Id. Saxon began servicing the loan in July 2011, without addressing any of the disputed issues. Id. ¶ 31. Plaintiff alleges that Saxon either did not review Plaintiff's file prior to beginning servicing, or that Saxon did not receive Plaintiff's file prior to beginning servicing. Id. ¶ 32. Soon after Saxon began servicing the loan, Plaintiff started to receive form letters indicating that her loan was in default and her house was in jeopardy of foreclosure. Id. ¶ 31. Plaintiff continued to contact Saxon regarding the issues with the loan and sent another letter to Bank of America. Id. ¶ 33.

In October 2011, Plaintiff requested a copy of the mortgage documents that were transferred to Saxon. Id. ¶ 34. Despite receiving acknowledgment of her request, Saxon never replied to it. Id. She made the request again, but Saxon again did not provide documents and suggested that Plaintiff contact Bank of America to obtain the documents. Id. Plaintiff believes that Saxon did not receive the loan file from Bank of America. Id. ¶ 35.

Beginning in October 2011, Saxon sent representatives and field inspectors to Plaintiff's house to make observations about the house and to place notices on the door instructing Plaintiff to contact Saxon. Id. ¶ 36. The representatives waited until they thought Plaintiff was not home or would not see them approach the house. Id. On one occasion, a representative told Plaintiff that he was paid to place the notices according to a set schedule, regardless of the actual contact occurring

between Saxon and Plaintiff. Id. Plaintiff believes that Saxon intended to bill her for these visits, despite the fact that she was in constant contact with them. Id. ¶ 37.

In October and November 2011, Plaintiff sent additional letters to Bank of America detailing the loan modification errors and requesting specific documents. Id. ¶ 38. She also made a third request for documents to Saxon. Id. ¶ 39. Saxon responded that no representative was assigned to Plaintiff's file and referred her to a foreclosure attorney. Id. On February 7, 2012, Saxon partially responded to Plaintiff's request for documents, but the documents they produced were not responsive. Id. On February 16, 2012, Plaintiff received the "entirety" of her file from Saxon, but alleges that it was missing many significant documents. Id.

Saxon threatened to start a foreclosure action on multiple occasions and in December 2011 and January 2012, Plaintiff repeatedly called Saxon in an attempt to learn the amount of money required to bring the mortgage back to good standing. Id. ¶ 40. In January 2012, Plaintiff requested Saxon's physical address so that she could send a certified check, but Saxon employees refused to provide the physical address and Plaintiff was informed that certified checks would be rejected. Id. ¶ 41. Plaintiff alleges that on January 6, 2012, "after refusing to receive [Plaintiff's] tender," Saxon assigned her an "advocate" for her loan. Id. ¶ 42.

Plaintiff filed her first Home Affordable Modification Program ("HAMP") application on January 23, 2012.[5] Id. ¶ 43. For the next few months, Saxon requested additional documents that

---

[5] HAMP is a federally sponsored program that was included in the Emergency Economic Stabilization Act, 12 U.S.C. § 5211, in response to rapidly deteriorating financial market conditions in the late summer and early fall of 2008. The centerpiece of the Act was the Troubled Asset Relief Program ("TARP"), which authorized the Secretary of the Treasury to "implement a plan that seeks to maximize assistance for homeowners and . . . encourage the servicers of the underlying mortgages . . . to take advantage of . . . available programs to minimize foreclosures." 12 U.S.C. § 5219(a). The Act also gave the Secretary the authority to "use loan guarantees and credit

they claim Plaintiff was missing, while Plaintiff maintains that many of the documents had already been provided. Id. Plaintiff believes that Saxon is no longer in the business of servicing mortgage loans. Id. ¶ 47.

### D. Ocwen

On May 14, 2012, Plaintiff was informed that Ocwen would begin servicing the loan on June 1, 2012. Id. ¶ 44. When the mortgage was transferred to Ocwen, Plaintiff's HAMP application was still under review. Id. ¶ 45. Saxon assured Plaintiff that the HAMP application would be transferred to Ocwen and that processing the application would not be interrupted by the transfer. Id. Ocwen immediately began sending Plaintiff form letters regarding the loan's delinquency. Id. ¶ 48. Ocwen assigned Plaintiff a relationship manager, however, the relationship manager was frequently changed and was inaccessible to Plaintiff because Plaintiff did not have their direct phone line. Id. ¶ 50. Plaintiff believes that Ocwen constantly reassigned her mortgage loan to new representatives as part of a deliberate scheme. Id. ¶ 51. The effect of the constant reassignment was that Plaintiff constantly had to re-explain the situation to each new representative, and no representative stayed assigned to Plaintiff's account long enough to see even a small process through. Id.

---

enhancements to facilitate loan modifications to prevent avoidable foreclosures." Id. In February 2009, the Secretary set aside $50 billion of TARP funding to induce lenders to refinance mortgages with more favorable interest rates to allow distressed homeowners to avoid foreclosure. Wigod v. Wells Fargo Bank, N.A., 673 F.3d 547, 556 (7th Cir. 2012). The Secretary negotiated Servicer Participation Agreements ("SPAs") with mortgage lenders, including Bank of America. See http://www.makinghomeaffordable.gov/get-answers/Pages/get-answers-how-contact-mortage-company.aspx (last accessed Dec. 29, 2015). The SPAs require servicers to identify homeowners who were in default or would likely soon be in default on their mortgage payments, and to provide mortgage modification for eligible participants. See Wigod, 673 F.3d at 556. HAMP included supplemental guidelines outlining the criteria for determining a participant's eligibility. Id.

Plaintiff also believes that Saxon failed to provide Ocwen with her file. Id. ¶ 52. On June 28, 2012, Ocwen requested the entire loan file directly from Plaintiff, which she provided. Id. Saxon claimed that the file was transferred in its entirety, however, when Ocwen disclosed the documents that were transferred, the file was missing Plaintiff's HAMP application and her documentation regarding Bank of America's modification errors. Id. Ocwen advised Plaintiff to get the documents from Saxon. Id. Saxon, in turn, told Plaintiff they could not respond to her request because Ocwen was her current servicer. Id.

On June 13, 2012, Ocwen denied Plaintiff's HAMP application on the basis that it was incomplete. Id. ¶ 53. Plaintiff contends that the documents Ocwen claims were missing had, in fact, been disclosed multiple times. Id. Plaintiff filed another HAMP application on June 29, 2012. Id. ¶ 56. The application was denied on July 30, 2012 because Ocwen was "unable to create a monthly payment with at least a 10% principal and interest deduction." Id. On August 10, 2012, Ocwen denied Plaintiff's June HAMP application for a second reason, specifically that the new loan payment did not comply with HAMP's income requirements. Id. Plaintiff protested the denial on the basis that Ocwen did not use Plaintiff's stated income. Id.

On June 15, 2012, Ocwen informed Plaintiff that they were unable to modify her loan because Bank of America, the loan's owner, did not modify loans. Id. ¶ 54. The next day, however, they informed her that HAMP's new guidelines indicated that modification was possible. Id. On June 26, 2012, Ocwen sent Plaintiff a generic letter about loan modification, even though it had recently told her that Bank of America did not allow for modification. Id. ¶ 55.

A multi-state investigation was conducted regarding Ocwen's loan servicing practices. Id. ¶ 57. Following the investigation, Ocwen's CEO issued a statement requesting that anyone with

8

loan servicing complaints send him a complaint that his office would review. Id. Plaintiff sent a complaint, along with detailed attachments. Id. Ocwen did not respond. Id.

Plaintiff submitted a third HAMP application to Ocwen on September 26, 2012. Id. ¶ 58. Plaintiff was notified that the application was denied because Bank of America had "very technical and strict guidelines for participating in HAMP." Id. Plaintiff later received a separate letter explaining that her modification was denied for another reason, namely that she had submitted two prior applications. Id. ¶ 59. However, Plaintiff contends that she was forced to submit multiple applications because of Saxon and Ocwen's processing errors. Id. Plaintiff filed a fourth HAMP application on February 19, 2013. Id. ¶ 60. She received a letter denying the application based on the wrong income information on April 4, 2013; however, the letter was dated November 28, 2012, more than four months before Plaintiff filed the fourth HAMP application. Id. Plaintiff believes that the fourth application was not considered by Ocwen until May 2013, when Ocwen requested additional supporting documents. Id. Plaintiff sent the documents on June 14, 2013 and Ocwen responded the same day that the documents were too old. Id. Plaintiff attributes this problem to Ocwen's failure to timely notify her that the documents were missing. Id. Plaintiff filed a fifth HAMP application on June 14, 2003. Id. ¶ 61.

While dealing with Ocwen, Plaintiff filed complaints with the Consumer Financial Protection Bureau and the New York State Department of Financial Services. Id. ¶¶ 62, 63. Ocwen disclosed information to these agencies that it had withheld from Plaintiff, telling her that the documents did not exist. Id. ¶ 63. Plaintiff also contacted nonprofit entities, Credibility, and Home Headquarters, who ran independent calculations based on HAMP modifications and repeatedly found that Plaintiff qualified for the HAMP program based upon the statutory and regulatory

formulas.  Id. ¶ 64.

Plaintiff contends that because Bank of America, its subsidiary, BAC, and its agents, Saxon and Ocwen, failed to properly modify Plaintiff's loan multiple times, she no longer qualifies for a HAMP modification.  Id. ¶ 65.  Plaintiff further argues that Defendants continue to add excessive fees that would never have been assessed absent Defendants' failures to remedy the loan's errors. Id.  As a result, Plaintiff has lost the use of the equity in her home, which is presently valued at approximately $330,000 and was valued at $165,000 at the time the loan was originally modified. Id. ¶ 66.  Plaintiff contends that the loan's balance continues to be improperly computed at close to $300,000 because of the improper fees that have been assessed and ongoing servicing errors.  Id. ¶ 67.

Plaintiff filed the instant Complaint on February 27, 2015, asserting the following causes of action (1) unfair and deceptive acts and practices in violation of New York General Business Law § 349(a); (2) breach of contract for Defendants' bad faith failure to correct and modify the loan; (3) interference with Plaintiff's rights as a third party beneficiary to Bank of America's participation in the HAMP program; (4) negligent denial of Plaintiff's HAMP applications; (5) tortious interference with contractual relations; (6) failure to provide required disclosures under the Truth in Lending Act ("TILA"); (7) failure to provide required disclosures under the Real Estate Settlement Procedures Act ("RESPA"); and (8) breach of the covenant of good faith and fair dealing.  See id.

Plaintiff seeks to have the loan reformed to correct the errors included in the 2009 modification, the forgiveness of fees and expenses caused by Defendants' actions, and monetary damages.  Id. ¶ 25.

## III.    LEGAL STANDARD

To survive a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 663 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)); see also FED. R. CIV. P. 12(b)(6). A court must accept as true the factual allegations contained in a complaint and draw all inferences in favor of a plaintiff. See Allaire Corp. v. Okumus, 433 F.3d 248, 249-50 (2d Cir. 2006). A complaint may be dismissed pursuant to Rule 12(b)(6) only where it appears that there are not "enough facts to state a claim to relief that is plausible on its face." Twombly, 550 U.S. at 570. Plausibility requires "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [the alleged misconduct]." Id. at 556. The plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully." Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556). "[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Id. (citing Twombly, 550 U.S. at 555). Where a court is unable to infer more than the mere possibility of the alleged misconduct based on the pleaded facts, the pleader has not demonstrated that she is entitled to relief and the action is subject to dismissal. See Iqbal, 556 U.S. at 678-79.

## IV.     DISCUSSION

### A.  New York General Business Law § 349

New York General Business Law § 349 prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service." N.Y. GEN. BUS. LAW § 349(a). To state a claim under § 349, "a plaintiff must demonstrate that (1) the defendant's deceptive acts were directed at consumers, (2) the acts are misleading in a material way, and (3) the

plaintiff has been injured as a result." <u>Maurizio v. Goldsmith</u>, 230 F.3d 518, 521 (2d Cir. 2000).

Defendants argue that Plaintiff has not alleged that Defendants engaged in any challenged practice that is consumer-oriented or that was misleading. Mem. at 5. In response, Plaintiff requests leave to amend the Complaint. Opp'n at 3. Plaintiff contends that the amended complaint will "clarify that what happened to [Plaintiff] was a part of a systemic policy that deceived the public into believing that the Defendants' servicers were acting in good faith and servicing loans in good faith, when the Defendants were engaged in systemic deceptive practices aimed at foiling consumers' abilities to have their loans properly serviced or modified." <u>Id.</u> It must be noted that in her Opposition, Plaintiff does not seek leave to amend, but rather, Plaintiff requests leave to file a motion to amend. <u>Id.</u>

Leave to amend a pleading should be "freely given when justice so requires." FED. R. CIV. P. 15(a). District courts are vested with broad discretion to grant a party leave to amend, and should deny such a request only in the face of undue delay, bad faith, undue prejudice to the non-movant, futility of amendment, or where the movant has repeatedly failed to cure deficiencies in previous amendments. <u>Foman v. Davis</u>, 371 U.S. 178, 182 (1962); <u>SCS Commc'n, Inc. v. Herrick Co.</u>, 360 F.3d 329, 345 (2d Cir. 2004). "The party opposing a motion for leave to amend has the burden of establishing that granting such leave would be unduly prejudicial." <u>Media Alliance v. Mirch</u>, No. 09-CV-659, 2010 WL 2557450, at *2 (N.D.N.Y. June 24, 2010) (Kahn, J.) (quoting <u>New York v. Panex Indus.</u>, No. 94-CV-0400, 1997 WL 128369, at *2 (W.D.N.Y. Mar. 14, 1997)).

Defendants argue that leave to amend should be denied because any amendment would be futile. Reply at 2. Futility is an appropriate basis for denying leave to amend, and "should be contemplated within the standards necessary to withstand a motion to dismiss." <u>Vail v. Fischer</u>, No.

9:12-cv-1718, 2013 WL 5406637, at *3 (N.D.N.Y. Sept. 25, 2013). Here, Plaintiff has not

submitted a proposed amended complaint, but rather requests leave to file an amended complaint to

clarify that "Defendants were engaged in systemic deceptive practices aimed at foiling consumers'

abilities to have their loans properly serviced or modified." Opp'n at 3. Contrary to Defendants'

argument that similar § 349 claims are routinely dismissed when they involve an individual loan

dispute, the Court finds that allowing amendment would not be futile if Plaintiff can show that

Defendants were operating under a systemic policy that applied to generally to all consumers. See,

e.g., Reynolds v. Xerox Educ. Servs., No. 13-CV-1223, 2014 WL 4437622, at *6 (N.D.N.Y. Sept.

9, 2014) (Kahn, J.) (finding consumer-oriented act where defendant was in the business of servicing

student loans and issued form documents to plaintiff, just as it did to other borrowers); Kapsis v.

Am. Home Mortg. Servicing, 923 F. Supp. 2d 430, 449 (E.D.N.Y. 2013) (finding general business

practice sufficiently aimed at the public where the plaintiff alleged that loan servicer failed to

properly credit payments on accounts, and issued false or misleading monthly statements); Cyphers

v. Litton Loan Servicing, 503 F. Supp. 2d 547, 553 (N.D.N.Y. 2007) (finding consumer-oriented act

where defendant was in the business of servicing loans and had obtained plaintiff's loans, along

with others, as part of a pooling and servicing agreement);. Accordingly, Plaintiff's request to file a

motion to amend is granted and Plaintiff is instructed to file a formal motion within thirty (30) days

of the issuance of this Memorandum-Decision and Order.

**B. Breach of Contract**

*1. Breach of Contract for Bad Faith Failure to Correct or Modify the Mortgage*

Defendants argue that Plaintiff's second cause of action for breach of contract should be

dismissed because she has not identified a contractual provision that has been breached and has also

failed to allege that she performed her obligations under the contract. Mem. at 7. "To state a claim for breach of contract under New York law, a plaintiff must allege: (1) a contract; (2) performance of the contract by one party; (3) breach of the contract by the other; and (4) damages." Adams v. Smith, No. 07-cv-0452, 2010 WL 3522310, at *15 (N.D.N.Y. Sept. 1, 2010) (Kahn, J.) (quoting Universal Marine Med. Supply v. Levecchio, 8 F. Supp. 2d 214, 221 (E.D.N.Y. 1998)).

The Court finds that Plaintiff has not stated a *prima facie* case for breach of contract. In the Complaint, Plaintiff recounts Defendants' repeated failures to fix the perceived errors in her modified mortgage, as well as the alleged improper denial of her HAMP applications. Compl. ¶¶ 77-85. However, Plaintiff fails to allege any specific contractual provision that was breached by Defendants' conduct. See M&T Bank Corp. v. LaSalle Bank Nat. Ass'n, 852 F. Supp. 2d 324, 334 (W.D.N.Y. 2012) ("A claim or counterclaim based on breach of contract must identify the specific contractual provision(s) allegedly breached."); see also Paul v. Bank of Am. Corp., No. 09-CV-1932, 2011 WL 684083, at *5 (E.D.N.Y. Feb. 14, 2011) (dismissing plaintiff's breach of contract claim after finding that plaintiff's failure to identify a specific provision that was allegedly breached was a "fatal flaw"). Accordingly, Plaintiff's second cause of action for breach of contract is dismissed.

### 2. Implied Covenant of Good Faith and Fair Dealing

Plaintiff's eighth cause of action is based upon a breach of the covenant of good faith and fair dealing, which is implied in all contracts. Opp'n at 4; N.Y. Univ. v. Continental Ins. Co., 87 N.Y.2d 308, 318 (1995). Plaintiff contends that a plaintiff pleading a breach of the covenant of good faith and fair dealing does not require citation to a specific contractual provision, because the covenant applies to the contract as a whole. Opp'n at 4 (citing Wood v. Lucy, 222 N.Y. 88, 91

14

(1917)).

New York law recognizes an implied covenant of good faith and fair dealing in every contract. Hoover v. HSBC Mortg. Corp., 9 F. Supp. 3d 223, 248 (N.D.N.Y. 2014). This duty encompasses "any promises which a reasonable person in the position of the promisee would be justified in understanding were included." Rowe v. Great Atl. & Pac. Tea Co., 385 N.E.2d 566, 569 (N.Y. 1978) (quoting 5 WILLISTON, CONTRACTS § 1293, at 3682 [rev ed 1937]). Under this duty, "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." Kirke La Shelle Co. v. Armstrong Co., 188 N.E. 163, 167 (N.Y. 1933). "Where the contract contemplates the exercise of discretion, this pledge includes a promise not to act arbitrarily or irrationally in exercising that discretion." Dalton v. Educ. Testing Serv., 663 N.E.2d 289, 292 (N.Y. 1995).

Plaintiff alleges that Bank of America breached its loan contract with Plaintiff by delegating its loan servicing to other entities who have "negligently or in bad faith serviced the mortgage such that [Plaintiff's] HAMP modification was a practical impossibility, despite her eligibility." Compl. ¶ 17. She alleges that a promisee would reasonably expect the promisor to properly handle the loan file, process paperwork, calculate her balance, and apply payments in good faith and fairly. Opp'n at 5. While Defendants argue that Plaintiff's failure to make her mortgage payments on time constitutes a breach of contract in its own right, Mem. at 7, Plaintiff argues that her default on her mortgage payments triggers an additional duty on the part of Defendants to act reasonably and provide Plaintiff with access to mortgage relief programs that were being offered. Opp'n at 5. Defendants do not specifically address Plaintiffs' good faith and fair dealing claim, instead addressing their arguments to a traditional "breach of contract" claim. See Mem. at 6-8. The Court

finds that the Complaint contains multiple allegations of intentional conduct by Defendants that could support a finding of breach of good faith and fair dealing.  See Adams, 2010 WL 3522310, at *16 (finding defendant's conclusory statement that plaintiff's breach of good faith and fair dealing claim was insufficiently pleaded could not support motion to dismiss); see also Leghorn v. Wells Fargo Bank, N.A., 950 F. Supp. 2d 1093, 1120 (N.D. Cal. 2013) ("[T]he Plaintiffs here have stated a claim under the implied covenant that Defendants abused this discretion by acting in bad faith and outside the reasonable expectations of the parties. Whether Defendants' acts were done in bad faith and not within the reasonable expectations of the parties is a question of fact that cannot be decided at the pleading stage.").  Accordingly, Defendants' Motion to dismiss Plaintiff's breach of the implied covenant of good faith and fair dealing claim is denied.

### 3. *Private Right of Action Under HAMP*

"The law is clear that HAMP 'does not create a private right of action for borrowers against loan servicers.'" Jordan v. Chase Manhattan Bank, No. 13 Civ. 9015, 2014 WL 3767010, at *7 (S.D.N.Y. July 31, 2014) (quoting Wheeler v. Citigroup, 938 F. Supp. 2d 466, 471 (S.D.N.Y. 2013)). Defendants move to dismiss Plaintiff's second, third, and fourth causes of action on the basis that HAMP does not provide for a private right of action.  Mem. at 8.  Plaintiff counters that HAMP is not the vehicle by which she seeks recovery on these counts; rather, HAMP's provisions inform the merits of the various state law claims Plaintiff brings in the second, third, and fourth cause of action.  Opp'n at 3.

A plaintiff cannot avoid the fact that HAMP does not provide for a private right of action by pleading HAMP violations via other causes of action.  See Davis v. Citibank, N.A., 984 N.Y.S.2d 388 (App. Div. 2014).  In Davis, the plaintiffs entered an agreement with Citimortgage in

accordance with HAMP after experiencing difficulties paying their mortgage. Id. at 390. The

agreement provided that if the plaintiffs met all HAMP requirements during a trial period, they

would be offered a permanent HAMP modification. Id. The plaintiffs later filed suit, asserting

claims for breach of contract and violation of General Business Law § 349, *inter alia*. Id. The

appellate court affirmed the trial court's dismissal of the complaint in its entirety, reasoning that

"[s]ince the plaintiffs' claims here are intertwined with the defendants' alleged obligations under the

HAMP, and as no private right of action exists under the HAMP, the Supreme Court should have

granted the defendants' motion to dismiss the amended complaint on the ground that it failed to

state a cause of action." Id. at 392.


### a. Third-Party Beneficiary Status

Plaintiff's third cause of action alleges that she is a third-party beneficiary of Bank of

America's contractual obligations under HAMP. Compl. ¶¶ 90-91. The issue of whether a borrower

is a third-party beneficiary to a service party agreement between a mortgage servicer and the

government is an issue of first impression among courts in the Second Circuit. Rivera v. Bank of

Am. Home Loans, No. 09 CV 2450, 2011 WL 1533474, at *3 (E.D.N.Y. Apr. 21, 2011). Under the

Restatement of Contracts, a plaintiff who claims "to be the intended third-party beneficiary of a

government contract must show that he was 'intended to benefit from the contract and that the third-

party beneficiary claims are consistent with the terms of the contract and the policy underlying it.'"

Id. at *4 (quoting Speleos v. BAC Home Loans Servicing, L.P., 755 F. Supp. 2d 304, 308 (D. Mass.

2010)).

The United States Department of the Treasury established HAMP pursuant to the Emergency

17

Economic Stabilization Act of 2008. 12 U.S.C. § 5211. The purpose of HAMP is to help distressed homeowners avoid foreclosure by obtaining loan modification. U.S. Dep't of the Treasury, Home Affordable Modification Program Guidelines, § VII, 610 (Mar. 4, 2009); <u>see also</u> <u>Speleos</u>, 755 F. Supp. 2d at 309 ("Indeed, the HAMP program is clearly intended to benefit qualified borrowers."). Courts interpreting the HAMP Guidelines have concluded that a plaintiff borrower may be able to state a claim against a defendant lender as an intended third-party beneficiary of the service contractor between the lender and Fannie Mae. <u>See</u> <u>Speleos</u>, 755 F. Supp. 2d at 309; <u>Marques v. Wells Fargo Home Mortg.</u>, No. 09-cv-1985, 2010 WL 2132131, at *6 (S.D. Ca. Aug. 12, 2010). Therefore, Plaintiff has met her burden of showing that she was an intended third-party beneficiary of Defendants contractual obligations under HAMP.

However, Plaintiff must also show that allowing third-party beneficiary claims is consistent with the terms of the contract. Restatement (Second) of Contracts, § 311(b). For example, in <u>Escobedo v. Countrywide Home Loans</u>, the court found that allowing third-party beneficiary status conflicted with the express language of the contract, which stated that the contract "shall inure to the benefit . . . of the parties to the Agreement and their permitted successors-in-interest." No. 09cv1557, 2009 WL 4981618, at *2-3 (S.D. Cal. Dec. 15, 2009). The court found that a borrower could not reasonably rely on the agreement as manifesting an intention to confer a right on him because the agreement at issue did not require that Countrywide modify eligible loans, rather the agreement just set forth the HAMP Guidelines. <u>Id.</u> at *3. The majority of courts who have addressed this issue decline to allow claims by third-party beneficiaries. <u>See</u> <u>Rivera</u>, 2011 WL 1533474, at *6 ("With very few exceptions, almost all federal courts to have addressed this precise issue have rejected borrowers' claims to enforce the Service Participation Agreements as third party

beneficiaries.") (collecting cases); <u>see also</u> <u>Thomas v. JPMorgan Chase & Co.</u>, 811 F. Supp. 2d 781, 797 (S.D.N.Y. 2011) (finding that borrower had no third-party right to enforce agreement between JP Morgan and Sallie Mae).  However, some courts have found that plaintiffs made a substantial showing that they are intended beneficiaries under HAMP.  <u>Compare</u> <u>Sampson v. Wells Fargo Home Mortg.</u>, No. CV 10-08836, 2010 WL 5397236, at *6 (C.D. Cal. Nov. 19, 2010) (finding that plaintiff made a substantial showing that she is an intended beneficiary of HAMP), <u>with</u> <u>Rivera</u>, 2011 WL 1533474, at *6-7 (finding that plaintiff failed to show that the agreement at issue conferred a right to third-party beneficiaries to enforce the agreement).

Plaintiff requests that given the lack of binding precedent on this issue that she be allowed to conduct discovery.  Opp'n at 8.  The Court finds that Plaintiff is entitled to conduct further discovery to determine whether conferring third-party beneficiary status is consistent with the terms of Bank of America's contractual obligations with the government.  Accordingly, Defendants' Motion to dismiss Plaintiff's third cause of action is denied.

<u>b.  Claim for Negligent Denial of HAMP Applications</u>

Plaintiff's fourth claim, that her HAMP applications were negligently denied, must fail. Here, Plaintiff is attempting to enforce Defendants' obligations under HAMP, which constitutes an impermissible attempt to create a private right of action.  <u>See</u> <u>Jordan</u>, 2014 WL 3767070, at *7; <u>Wheeler</u>, 938 F. Supp. 2d at 471; <u>Davis</u>, 116 A.D.3d at 823.  Accordingly, Plaintiff's fourth cause of action is dismissed.

**D.  Tortious Interference with Contract**

Under New York law, in order to state a claim for tortious interference with contractual relations, a plaintiff must allege: "(1) the existence of a valid contract between the plaintiff and a

third party; (2) the defendant's knowledge of the contract; (3) the defendant's intentional procurement of the third-party's breach of the contract without justification; (4) actual breach of the contract; and (5) damages resulting therefrom." Kirch v. Liberty Media Corp., 449 F.3d 388, 401-02 (2d Cir. 2006) (quoting Lama Holding Co. v. Smith Barney, 668 N.E.2d 1370, 1375 (N.Y. 1996)) (internal quotations omitted). Defendants argue that Plaintiff has failed to allege any of the necessary elements. Mem. at 10.

Plaintiff counters that Defendants "were aware that Plaintiff was a small businesswoman with many contractual and business relationships, including other mortgages and obligations relating to her small businesses . . . through her HAMP applications and especially her financial hardship affidavit." Opp'n at 11. Defendants were also aware that Plaintiff sometimes used her house as an asset to borrow against, since she previously obtained an equity line of credit mortgage. Id.

The Court finds that Plaintiff fails to allege several necessary elements of her tortious interference with contract claim. First, Plaintiff has not plausibly alleged adequate details about a specific contract between herself and a third party, instead merely alleging that Defendants' conduct has adversely affected her ability to "run, maintain, or start businesses, which has deprived her of income and has diminished her ability to enter into contractual relations." Compl. ¶ 102; see Plasticware, LLC v. Flint Hill Resources, LP, 852 F.Supp. 2d 398, 404 (S.D.N.Y. 2012) (dismissing claim for tortious interference with contract where plaintiff claimed generally that it had contracts with various parties, but did not provide details about the terms of the contracts or the specific parties involved); Bose v. Interclick, No. 10-CV-9183, 2011 WL 4343517, at *10-11 (S.D.N.Y. Aug. 17, 2011) (same); Ho Myung Moolsan Co. v. Manitou Mineral Water, 665 F. Supp. 2d 239,

20

255 (S.D.N.Y. 2009) (denying leave to amend tortious interference with contract claim that had been dismissed because plaintiffs failed to allege specifics about contract interference). Second, the Complaint is silent as to whether Defendants knew of Plaintiff's contracts with third parties, and Plaintiff only states in her Opposition that Defendants "were aware that [Plaintiff] was a small businesswoman with many contractual and business relationships." Opp'n at 11. "Although a defendant need not be aware of all the details of a contract, it must have actual knowledge of the specific contract." Medtech Prods. Inc. v. Ranir, 596 F. Supp. 2d 778, 796 (S.D.N.Y. 2008); see also Boehner v. Heise, 734 F. Supp. 2d 389, 404-05 (S.D.N.Y. 2010) (granting summary judgment where plaintiffs failed to offer evidence that defendants knew of any contracts, but merely stated that defendants knew that plaintiffs sold to their customers). Further, the Complaint does not allege that Defendants took any actions toward third parties with which Plaintiff had contracts, or that any third party breached its contract with Plaintiff. Accordingly, Plaintiff's claim for tortious interference with contract is dismissed.

### E. TILA and RESPA Claims

The statutes of limitations for filing claims under the Truth in Lending Act ("TILA"), 15 U.S.C. § 1640(e), and Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2614, ("RESPA") are both one year. See Cardiello v. The Money Store, 29 F. App'x 780, 781 (2d Cir. 2002) (stating that TILA statute of limitations is "one year from the date of occurrence of the violation"); Done v. Option One Mortg., No. 09-CV-4770, 2011 WL 1260820, at *8 (E.D.N.Y. Mar. 30, 2011) ("[T]he RESPA statute of limitations is one year."). Claims under TILA and RESPA accrue when a plaintiff signs the fraudulent or deceptive loan document in question.

<u>Murphy v. Flagstar Bank, FSB</u>, No. 10-CV-0645, 2011 WL 4566139, at *1 (N.D.N.Y. Sept. 29, 2011) (Kahn, J.).

*1. TILA*

Defendants argue that Plaintiff's TILA and RESPA claims should be dismissed as untimely. Mem. at 10. Plaintiff does not address the timeliness of her TILA or RESPA claims in her Opposition.[6] In the Complaint, Plaintiff alleges that "Defendant Bank of America, through its agents, Saxon and OCWEN, has repeatedly failed to provide [Plaintiff] disclosures required by the Truth in Lending Act." Compl. ¶ 103. Plaintiff claims that she has requested her "mortgage's owner, the amount due, her arrearages, and charges that are being added to her mortgage's balance." <u>Id.</u> ¶ 103. Plaintiff further alleges that due to their failure to provide the requested information, "Saxon violated TILA five times and OCWEN violated TILA four times while agents for Bank of America." <u>Id.</u> ¶ 104. Plaintiff requested her mortgage documents from Saxon in September, October, and November of 2011. <u>Id.</u> ¶¶ 34-37. Plaintiff concedes that Saxon stopped servicing her loan on June 1, 2012. <u>Id.</u> ¶¶ 46-47. Therefore, the one-year statute of limitations to bring a TILA claim against Saxon expired no later than June 1, 2013, well before the Complaint was filed in February 2015. Similarly, Plaintiff does not allege any conduct by Ocwen following June 20, 2013. <u>Id.</u> ¶ 61. Therefore, the time period to file a TILA claim against Ocwen expired no later than June 1, 2014. Accordingly, Plaintiff's TILA claims are untimely. <u>See</u> <u>Rodriguez v. SLM Corp.</u>, No. 07cv1866, 2009 WL 3769217, at *2-3 (D. Conn. Nov. 10, 2009) (finding TILA claim that was previously dismissed as untimely was not saved by equitable tolling based on fraudulent

---

[6] In the accompanying Attorney Affirmation filed with Plaintiff's Opposition, Plaintiff concedes that her TILA and RESPA claims are untimely. <u>See</u> Dkt. No. 21 ("Oudemool Affirmation") ¶ 3.

concealment where plaintiff did not plead fraudulent concealment with particularity); see also Boursiquot v. Citibank F.S.B., 323 F. Supp. 2d 350, 354 (D. Conn. 2004) ("[I]t is generally established that mere nondisclosures provide insufficient grounds for tolling the statute of limitations, regardless of when the plaintiffs should have discovered the nondisclosure.").

### 2. RESPA

Plaintiff alleges that Defendant Bank of America, through its agents, Saxon and Ocwen, violated RESPA by again failing to make requisite disclosures. Compl. ¶ 107. For the same reasons stated with respect to Plaintiff's TILA claims, the Court finds that any RESPA claims against Saxon should have been filed no later than June 1, 2013. With respect to Ocwen, Plaintiff alleges that she submitted a Qualified Written Request to Ocwen in 2012, and "Ocwen failed to provide the information requested in violation of RESPA." Id. ¶ 108. Plaintiff's RESPA claim against Ocwen should have been filed within one year of Ocwen's failure to provide the information requested in the form, which would have occurred some time in 2013. Accordingly, Plaintiff's RESPA claims are untimely.

## V.    CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that Defendants' Motion (Dkt. No. 15) to dismiss is **GRANTED in part**, as to the dismissal of Plaintiff's breach of contract claim; Plaintiff's claim that her HAMP applications were negligently denied; Plaintiff's tortious interference with contract claim; and Plaintiff's TILA and RESPA claims; and **DENIED in part**, as to Plaintiff's New York General Business Law § 349 claim; Plaintiff's breach of the implied covenant of good faith and fair dealing claim; and Plaintiff's

claim that she is a third-party beneficiary of Bank of America's obligations under HAMP; and it is further

ORDERED, that Defendant Ocwen's Motion (Dkt No. 18) to join Bank of America's Motion is **GRANTED**; and it is further

ORDERED, that Plaintiff is instructed to file a motion to amend her New York General Business Law § 349 claim **within thirty (30) days** of the issuance of this Memorandum-Decision and Order; and it is further

ORDERED, that the Clerk of the Court serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

DATED:        December 30, 2015
                   Albany, New York


Lawrence E. Kahn
U.S. District Judge